Filed 8/24/20  P. v. Martinez CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VICTOR AURELIANO RAMIREZ MARTINEZ,<br><br>Defendant and Appellant. | 2d Crim. No. B291678<br>(Super. Ct. No. 1481236)<br>(Santa Barbara County) |

Victor Aureliano Ramirez Martinez appeals the judgment entered after a jury convicted him of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189).  In addition to finding that the murder was willful, deliberate, and premeditated, the jury also found true special circumstance allegations that appellant committed the murder while engaged in the commission of a

---

[1] All statutory references are to the Penal Code unless otherwise stated.

burglary, robbery, and rape with an instrument (§ 190.2, subd. (a)(17)). The jury further found that in committing the murder appellant used a deadly weapon, i.e., a hammer (12022, subd. (b)(1)). The trial court sentenced him to life without the possibility of parole (LWOP) plus one year. Appellant raises claims of insufficient evidence and instructional error. He also contends the court erred in ordering him to pay certain assessments and fees without first determining his ability to pay them, as contemplated in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). We affirm.

**STATEMENT OF FACTS**

***Prosecution***

On the morning of July 24, 2015, Marilyn Pharis called 911 to report that she had been attacked while sleeping in her home in Santa Maria. Pharis said she had been awakened by the assailant, who repeatedly hit her with his fists and a hammer he had taken from her garage. The man also choked her and pulled down her pajama bottoms. Pharis said, "He was trying to get to my ass. I think he came on the back of my pants." She also reported that she had bitten her assailant's arm and pulled off his rosary necklace during the attack.

When the police arrived at Pharis's residence, she was holding a hammer and had swelling on her eye, mouth and face. Her head was bleeding, her pajamas were bloody, and her face appeared asymmetrical. There was also a wet spot on the back of her pajamas. When she was being treated in the hospital emergency room, she told a physician she "woke up to find a man on top of her strangling her" and that "there were three distinct episodes where she was strangled" and lost consciousness.

Appellant was apprehended a few hours after the attack outside a house about a mile away. At the time of his arrest he was carrying a backpack that held a container of approximately $200 worth of change, a knife, a glass pipe, a rosary necklace, and other items that had been taken from Pharis's residence. He also had a human bite mark on his arm and red marks on the back of his neck.

When appellant was interviewed later that day, he first claimed that another man he knew as Juan[2] had committed the crime and had coerced appellant to hit Pharis to knock her out. Appellant later admitted that he acted alone. After smoking methamphetamine, appellant and Juan used a stake to pry open the locked door to Pharis's garage. As appellant was at the unlocked door leading from the garage to the house, Juan told him to be quiet because someone was inside the house.

Appellant told the police that Pharis, who was sleeping on a mattress in the closet of her bedroom, woke up after Juan made noise putting a container of change from Pharis's bedroom into his backpack. Juan told appellant to attack Pharis, so he grabbed her by the neck and began choking her. He also repeatedly hit her with a hammer he had taken from Pharis's garage and punched her with his fists. According to appellant, he accidentally put two of his fingers in Pharis's vagina when she tried to stand up; he denied that he attempted to rape her. Appellant attacked Pharis "[b]ecause she saw me and because [Juan] told me he was going to get in trouble with his friends.

---

[2] Jose Villagomez was tried jointly with appellant for the murder of Pharis. Before the prosecution had completed its case-in-chief, Villagomez pleaded guilty to first degree murder.

3

And since I'm always by myself and then she saw me, and I didn't want problems with the police . . . ."

After Pharis was examined in the hospital emergency room, she was determined to be in critical condition due to severe, life-threatening trauma. She had multiple fractures of the face, a fractured hyoid bone, bruising across her thyroid cartilage area as the result of severe strangulation, extensive swelling around her eyes and under her jaw and neck, and one of her eyes was swollen shut.

Later that day, Pharis was examined by Dr. Thomas Bosshardt, a trauma surgeon. Dr. Bosshardt's main concern was possible complications from internal bleeding. The possibility of a deep vein thrombosis (DVT) was of particular concern. DVT's, which are blood clots that typically form in the lower extremities of the body, do not form immediately and usually take several days to develop. Preventative measures include ambulating the patient when possible and the wearing of compression socks on the lower extremities. Although physical therapy can also help prevent a DVT, it was not a proper treatment for Pharis during the acute phase of her trauma due to the risk of bleeding and breathing problems. Dr. Bosshardt determined that Pharis could not be given blood-thinning medication due to the risk of internal bleeding from her injuries. If Pharis had not suffered trauma, she would have had a very low risk of developing a DVT.

Pharis was 64 years old at the time of the attack and had a history of intermittent atrial fibrillation, i.e., an irregular heartbeat. The day after the attack she was experiencing atrial fibrillation, her heart rate was 180 to 190, and she complained of significant chest pain. Pharis did not report any pain in her legs and there was no other evidence of a DVT. Dr. Roman Winter,

4

who also treated Pharis while she was in the hospital, did not see anything in Pharis's chart to suggest she might have formed a blood clot in either of her legs.

On the afternoon of July 27th, Pharis's oxygen requirement had increased. She was also unable to walk and complained of chest pain. Three or four days after the attack, she began physical therapy but had difficulty walking 75 feet. Pharis, however, did not complain of any pain in her legs and there was no evidence of a DVT.

Five days after the attack, Pharis's condition was improving and her heart rhythm was normal. Dr. Mark Sandquist, who was treating Pharis at that time, planned to keep her in the hospital for one more day to ensure that her heart rhythm remained normal. Because Pharis was only able to walk about 75 feet, Dr. Sandquist also wanted to determine if she could improve her ability to walk and eliminate the need for supplemental oxygen. During physical therapy, Pharis complained for the first time about pain in her left leg. Dr. Sandquist examined the leg and found no signs of swelling. Pharis had "a negative Homans' sign, which is a particular test to see if there's a clot evident."

The following night, a nurse noticed that Pharis's left leg appeared swollen. The nurse paged the emergency room doctor who was on call that night but received no response. The next morning, Dr. Sandquist was notified of the swelling. Because the leg was so swollen and painful, the compression device on Pharis's leg had been removed. An ultrasound scan revealed a blood clot in the leg and Pharis was given blood-thinning medication. She subsequently became unconscious and was transferred to the critical care unit. While she undergoing

5

additional treatment, the blood clot traveled to her lungs and she suffered a fatal cardiac arrest.

Dr. Manny Montez, who conducted the autopsy of Pharis, testified that she died as a result of the blood clot that travelled from her leg to her lungs. Dr. Montez explained that the clot developed "because [Pharis] was in the hospital immobile during the treatment of her assault, and she was at risk for developing a leg blood clot, which she did, and [it] broke off. Since [Pharis was] in the hospital for an assault, it is the assault that becomes the cause of the pulmonary emboli." The doctor opined that Pharis would not have developed the blood clot had she not been immobilized due to the attack. Doctors Sandquist, Winter, Bosshardt, and Ourieff offered similar expert opinions.

Dr. Montez also considered whether "from [Pharis's] admission until the time [she] die[d], [was] . . . a continuous sequence unbroken by any other sufficient intervening cause." Although gross negligence by hospital staff would have broken the causal chain, Dr. Montez "[didn't] see anything in the medical record[s] that falls under neglect or malpractice . . . ." When presented with a hypothetical tracking the prior testimony of the medical staff who participated in Pharis's treatment, Dr. Montez opined that there was an absence of medical malpractice. The doctor also opined that the initial response to the swelling of Pharis's leg had "no bearing on her cause of death."

### Defense

Dr. Enrique Lopez, a neuropsychologist, testified that appellant had a mild neurocognitive disorder. Dr. Lopez opined that as a result of this disorder, appellant had difficulty understanding verbal communications and thus may have given

6

inaccurate responses to the questions he was asked during his police interview.

## DISCUSSION

### I.

### *Sufficiency of the Evidence*

Appellant contends that his conviction of first degree murder must be reversed because the evidence is insufficient to prove (1) that the murder was willful, deliberated, and premeditated; and (2) that his attack on Pharis proximately caused her death.  Neither contention has merit.

In reviewing claims of insufficient evidence, we "must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054-1055, internal quotation marks omitted.)  We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict."  (*Ibid.*)

As the People note, appellant's claim that the evidence is insufficient to support the finding that the murder was willful, deliberate, and premeditated fails because all three of the jury's felony-murder special circumstance findings—none of which appellant challenges—are each independently sufficient to support his conviction of first degree murder.  (See *People v. Sanchez* (2001) 26 Cal.4th 834, 851 ["Ordinarily, if an alternative

7

theory of criminal liability is found unsupported by the evidence, the judgment of conviction may rest on any legally sufficient theory unaffected by the error, unless the record affirmatively demonstrates that the jury relied on the unsupported ground"]; see also, e.g., *People v. Payton* (1992) 3 Cal.4th 1050, 1061-1062 [any error in instructing the jury on willful, deliberate, and premeditated murder was harmless where the jury also found true the special-circumstance allegation that the murder was committed in the course of a rape or attempted rape].)

In any event, the evidence, when viewed in the light most favorable to the judgment, is sufficient to support the jury's finding that the murder was willful, deliberate, and premeditated. Our Supreme Court has identified three categories of evidence relevant to establishing premeditation and deliberation. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27; *People v. Brooks* (2017) 3 Cal.5th 1, 58-59; *People v. Houston* (2012) 54 Cal.4th 1186, 1216.) The categories include events occurring before the killing that indicate planning, motive to kill, and manner of killing that reflects a preconceived design to kill. (*Anderson*, at pp. 26-27.) The factors are neither exclusive nor invariably determinative. (*Brooks*, at pp. 58-59; *Houston*, at p. 1216.) Evidence of each category is not required to affirm a judgment of first degree murder. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 605.) The factors are merely a guide in determining whether the evidence supports an inference that the killing occurred as a result of preexisting reflection rather than a rash impulse. (*Brooks*, at p. 59.)

Appellant attacked Pharis while she was sleeping in her bed. He climbed on top of her, repeatedly hit her with a hammer and his fists, and sexually assaulted her. He then strangled her

8

three times; each time she regained consciousness after passing out, he strangled her again. Moreover, appellant admitted that he hit and strangled Pharis "[b]ecause she saw [him]" and he "didn't want problems with the police . . . ." From this evidence, the jury could reasonably find that appellant had the intent to kill Pharis and that he acted with deliberation and premeditation. (See, e.g., *People v. Memro* (1995) 11 Cal.4th 786, 863, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2 [sufficient evidence of deliberation and premeditation where defendant tied victim's hands with masking tape and strangled him, and the jury "could also have determined that [the victim] was killed to prevent him from later identifying [appellant] as his captor and sexual exploiter, a motive requiring calculation and reflection"]; see also, e.g., *People v. Thomas* (1992) 2 Cal.4th 489, 519 ["[t]he jury could conclude that defendant deliberately and premeditatedly killed [one victim] because he either had witnessed, or was about to witness [another victim's] murder"].)[3]

The evidence is also sufficient to prove that appellant's attack on Pharis was the cause of her death. Appellant's claim to

---

[3] Citing to *People v. Collins* (1961) 189 Cal.App.2d 575, 590, appellant also contends "that the prosecution is bound by its presentation of the defendant's statement as to how the killing occurred in the 'absence of proof to the contrary.'" Suffice to state that this doctrine does not apply where, as here, "'there is . . . other competent and substantial evidence which could establish guilt.' [Citation.] . . . [I]f there is any "'well established circumstances'" that is "'incompatible'" with the defendant's exculpatory statement, then the jury may consider all the evidence is determining whether to convict. [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 248.)

9

the contrary is based on the unsubstantiated premise that gross medical negligence was the superseding cause of Pharis's death.

A homicide conviction requires proof that the defendant's conduct proximately caused the victim's death. (*People v. Butler* (2010) 187 Cal.App.4th 998, 1009 (*Butler*).) Proximate cause in a criminal case is determined by ordinary principles of causation and is a question of fact for the jury. (*People v. Armitage* (1987) 194 Cal.App.3d 405, 420; *People v. Harris* (1975) 52 Cal.App.3d 419, 427.) The cause of death includes any "'act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the [death] and without which the [death] would not occur.'" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 48.) When there are concurrent causes of death, the defendant is still criminally responsible if his or her conduct was a substantial factor contributing to the result. (*Butler*, at p. 1009.)

When the victim's death is the result of an independent intervening act by a third party, that act may amount to a superseding cause absolving the defendant of criminal liability for a homicide. (See *People v. Funes* (1994) 23 Cal.App.4th 1506, 1523.) "However, in order to be 'independent' the intervening cause must be 'unforeseeable . . . [and] an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superseding cause.' [Citation.] On the other hand, a 'dependent' intervening cause will not relieve the defendant of criminal liability." (*Ibid.*) "'If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability. . . . The precise consequence need not have been foreseen; it is enough that the

10

defendant should have foreseen the possibility of some harm of the kind which might result from his act." [Citation.]' [Citation.]" (*Ibid.*)

"If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death. [Citations.]" (*People v. Roberts* (1992) 2 Cal.4th 271, 312.) "The defendant remains criminally liable if either the possible consequence might reasonably have been contemplated or the defendant should have foreseen the possibility of harm of the kind that could result from his act." (*People v. Crew* (2003) 31 Cal.4th 822, 847.) "[W]hen medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment *is the sole cause of death* and hence an unforeseeable intervening cause. [Citation.]" (*Roberts*, at p. 312, italics added.)

The evidence in this case showed that Pharis was severely beaten and repeatedly strangled by appellant in her own home. After Pharis was transported to the hospital, she was determined to be in critical condition as the result of the severe trauma appellant had inflicted upon her. While she was being treated for her injuries, she suffered a DVT that led to a fatal pulmonary embolism. Dr. Montez, the forensic pathologist who conducted the autopsy of Pharis and reviewed the medical records associated with her injuries and treatment, opined that the attack on Pharis was "the cause of the [fatal] pulmonary emboli." The doctor concluded that "[the time] from [Pharis's] admission until the time [she] die[d]" was a "continuous sequence unbroken by any other sufficient intervening cause." Dr. Montez also testified that "[i]n my opinion, I don't see anything in the medical record that falls under neglect or malpractice or misadventure."

11

The four doctors who treated Pharis similarly opined that Pharis would not have suffered the fatal pulmonary embolism but for the trauma she suffered as a result of appellant's attack on her.

Dr. Montez also opined, in response to a hypothetical tracking the evidence presented in the case, that no medical malpractice occurred. The doctor further opined that even if there had been medical malpractice, it would not alter his conclusion that the attack on Pharis was the medical cause of her death. According to Dr. Montez, the nurse's response to the swelling on Pharis's leg six days after the attack had "no bearing on her cause of death." The doctor then reiterated that "the cause of death clearly dates back to the assault, but [the pulmonary embolism] would be the mechanism in play."

Dr. Montez's expert testimony provided substantial evidence that Pharis's death was caused by the violent acts appellant committed against her. It is the jury's sole province to determine whether the doctor's expert testimony was persuasive. (See *People v. Mercer* (1999) 70 Cal.App.4th 463, 466-467.)

Appellant makes no meaningful effort to challenge Dr. Montez's expert opinion. He offered no expert testimony that Pharis's death was caused by medical negligence, much less gross medical negligence, or that such negligence was the sole cause of her death. (See *Kelley v. Trunk* (1998) 66 Cal.App.4th 519, 523 (*Kelley*) [expert testimony generally required to show that a medical practitioner failed to meet the prevailing standard of care, except in cases where the negligence is obvious to laypeople].) His arguments also disregard the standard of review, which requires us to view the evidence in the light most favorable to the judgment. (*People v. Zamudio, supra,* 43 Cal.4th at p. 357.) Under this standard of review, a conviction cannot

12

reversed "'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict." (*Ibid.*)

In this case, the only expert testimony on the pertinent issue demonstrated that appellant's attack on Pharis was the cause of her death. As the prosecutor persuasively argued to the jury, "The only reason [Pharis] is not here today is because [appellant] broke into her house while she was sleeping, went right to her room, stole from her, beat her with weapons and hands, strangled her and took her breath away causing her to go unconscious three separate times, and sexually assaulted her while she was unconscious, landing her in the hospital, which caused the development of a D.V.T., which led to a pulmonary embolism, killing her on August 1st, 2015. [Appellant] is not only a substantial factor in her death, he is the reason she is not alive today." Appellant's claim that the jury was effectively compelled to find otherwise fails.

## II.

### *Instructional Error*

#### a. *Burglary*

The trial court instructed the jury on burglary pursuant to CALCRIM No. 1700.[4] Over appellant's objection, the court also

---

[4] The jury was instructed as follows: "Burglary is one of the theories of First Degree Felony Murder and is a charged Felony Murder Special Circumstance. [¶] To prove that the defendant is guilty of this crime the People must prove that: [¶] 1. The defendant entered a room within a building; [¶] AND [¶] 2. When he entered a room within a building, he intended to commit theft or sexual penetration with [a] foreign or unknown object. [¶] To decide whether the defendant intended to commit

gave the following pinpoint instruction: "The intent required for first degree burglary as defined in other instructions need not be in the mind of the defendant at the time of the initial entry into the structure, if he subsequently forms the intent and enters a room within the structure and if the subsequently entered room provides a separate and objectively reasonable expectation of protection from intrusion relative to the larger structure." Appellant contends the court erred in giving this pinpoint instruction. We are not persuaded.

A trial court should grant a request for a pinpoint instruction if it is supported by substantial evidence, it correctly states the law, and it is not argumentative or confusing. (*People v. Wilkins* (2013) 56 Cal.4th 333, 347.) "'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review.' [Citation.] The pertinent inquiry is

---

theft or sexual penetration with [a] foreign or unknown object, please refer to the separate instructions that I will give you on that crime. [¶] A burglary was committed if the defendant entered with the intent to commit theft or sexual penetration with [a] foreign or unknown object. The defendant does not need to have actually committed theft or sexual penetration with [a] foreign or unknown object as long as he entered with the intent to do so. The People do not have to prove that the defendant actually committed theft or sexual penetration with [a] foreign or unknown object. [¶] Under the law of burglary, a person enters a building if some part of his body penetrates the area inside the building's outer boundary. [¶] The People allege that the defendant intended to commit theft or sexual penetration with [a] foreign or unknown object. You may not find the defendant guilty of burglary unless you all agree that he intended to commit one of those crimes at the time of the entry. You do not all have to agree on which one of those crimes he intended."

14

whether the instructions as a whole fully and fairly set forth the applicable law.  [Citation.]  In making that determination, we assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment.  [Citation.]" (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1152.)

Section 459 defines burglary in relevant part as accomplished by "[e]very person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, . . . with intent to commit grand or petit larceny or any felony . . . ."  (§ 459.)  The requisite intent to commit theft or any felony must be formed at the time of entry into the statutorily specified structures.  (*People v. Holt* (1997) 15 Cal.4th 619, 669.)

In *People v. Sparks* (2002) 28 Cal.4th 71, our Supreme Court held that a defendant, who entered the victim's home upon her invitation and who later raped the victim when she retreated into a separate bedroom within the house, could be guilty of burglary even though he lacked the intent to commit a felony upon first entering the house.  (*Id.* at pp. 74-75, 87.)  The court concluded that "treating the entry at issue here as an entry for burglary is consistent with the personal security concerns of the burglary statute, because entry, from inside a home, into a bedroom of the home 'raise[s] the level of risk that the burglar will come into contact with the home's occupants with the resultant threat of violence and harm.'  [Citation.] . . . Accordingly, consistent with California decisions construing section 459 . . . , and consistent with the common law and the history of section 459, we conclude that the unadorned word

15

'room' in section 459 reasonably must be given its ordinary meaning." (*Id.* at p. 87.)

Here, the burglary felony murder special-circumstance allegation was premised on the theories that appellant entered Pharis's residence with the intent to commit a theft and a rape. As in *Sparks*, the jury could reasonably find that appellant formed his intent to rape Pharis after he entered her residence, but before he entered her bedroom. This fact pattern is correctly reflected in the pinpoint instruction. On the other hand, if defendant formed the intent to commit a theft before he entered the residence, this fact pattern would be supported by CALCRIM No. 1700. Contrary to appellant's claim, the pinpoint instruction was not redundant, nor did it "water down" the requirement that he had to form the requisite intent to commit a crime before he entered Pharis's bedroom. The instructions, as a whole, make this clear.

In any event, any error in giving the challenged pinpoint instruction would not compel a reversal of appellant's conviction. "Giving an instruction that is correct as to the law but irrelevant or inapplicable is error. [Citation.] Nonetheless, giving an irrelevant or inapplicable instruction is generally "'only a technical error which does not constitute ground for reversal.'" [Citation.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67.)

In light of the evidence, any reasonable juror would have found beyond a reasonable doubt that appellant entered Pharis's residence with the intent to commit a theft. Moreover, appellant does not challenge the special circumstance findings that he committed the murder in the course of a rape with an instrument and a robbery. Any error in giving the challenged instruction was thus harmless.

16

b. *Causation*

Without any objection from the defense, the jury was instructed on the issue of causation pursuant to CALCRIM Nos. 240[5] and 620.[6]  Appellant contends that the latter instruction was

<hr />

[5] The jury was instructed: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act.  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence.  [¶]  There may be more than one cause of death.  An act causes death, only if it is a substantial factor in causing the death.  A substantial factor is more than a trivial or remote factor.  However, it does not have to be the only factor that causes the death."

[6] The jury was instructed in accordance with CALCRIM No. 620 as follows:  "There may be more than one cause of death.  An act causes death only if it is a substantial factor in causing the death.  A *substantial factor* is more than an trivial or remote factor.  However, it does not need to be the only factor that causes the death.  [¶]  The failure of the doctors or medical staff to use reasonable care in treating Marilyn Pharis may have contributed to the death.  But if the injury inflicted by the defendant was a substantial factor causing the death, then the defendant is legally responsible for the death even though the doctors or medical staff may have failed to use reasonable care.  On the other hand, if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper treatment by the doctors or medical staff, then the defendant is not legally responsible for the death.  [¶]  Marilyn Pharis may have suffered from an illness or physical condition that made her more likely to die from the injury than the average person.  The fact that Marilyn Pharis may have been more physically

17

erroneously given because it "misdirected the jury from even considering whether the gross medical malpractice was a superseding cause relieving appellant of any culpability for the death of Ms. Pharis. Indeed, this causation instruction effectively directed the finding of causation against appellant."

This claim is forfeited. "'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370 (*Fiu*).)

In any event, the claim fails. "'In considering a claim of instructional error we must first ascertain what the relevant law provides, and then determine what meaning the instruction given conveys. The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights.' [Citation.]" (*Fiu, supra*, at p. 370.)

Contrary to appellant's claim, the challenged instruction did not misdirect the jury from considering whether Pharis's death was the result of gross medical negligence; indeed, the instruction plainly stated that "if the injury inflicted by the defendant was not a substantial factor causing the death, but the death was caused by grossly improper treatment by the doctors or medical staff, then the defendant is not legally responsible for

_____

vulnerable is not a defense to murder. If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. This is true even if Marilyn Pharis would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's actions. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

18

the death." The instruction thus adequately conveyed the concept of superseding causation. (See *Fiu*, *supra*, 165 Cal.App.4th at p. 372.)

In any event, appellant offered no evidence that Pharis's death was caused by gross medical negligence, much less that such negligence was the superseding cause of her death. (See *Fiu*, *supra*, 165 Cal.App.4th at pp. 373-374 [trial court had no sua sponte duty to instruct on superseding causation where no evidence was offered to support the instruction].) "Further '[e]ven if [the hospital staff's] actions could be described as an independent intervening cause of [Pharis's] death, they would relieve [appellant] of criminal liability only if the jury found that [appellant's action] was not concurrent cause of [the] death.' [Citation.] . . . ''Numerous cases have declared that if the defendant's conduct exposes persons in the class to which [the victim] belongs to a foreseeable risk of injury, and his act or omission contributes substantially to injury of that nature actually occurring, he may be held liable notwithstanding the fact that an unforeseeable independent intervening act is a concurring cause." [Citations.]''' (*Id*. at p. 375.) Moreover, it is well-settled that "[a] delay in [medical] treatment is not in fact an intervening force; it cannot in law amount to a supervening cause.' [Citation.]" (*People v. Autry* (1995) 37 Cal.App.4th 351, 361, italics omitted.) Accordingly, any error in failing to more fully instruct the jury on the concept of superseding causation was harmless. (*Ibid*; *Fiu*, at pp. 371-372.)[7]

_____

[7] In light of our conclusions, we also reject appellant's claim that the cumulative effect of the alleged instructional errors compels a reversal of his conviction.

### *Dueñas*

For the first time on appeal, appellant contends, in reliance on *Dueñas*, *supra*, 30 Cal.App.5th 1157, that the trial court erred by ordering him to pay a $30 criminal conviction assessment (Gov. Code, § 70373), a $40 court operations assessment (§ 1465.8, subd. (a)(1)), a $10,000 restitution fine (§ 1202.4), and a stayed $10,000 parole revocation fine (§ 1202.45) without first determining his ability to pay. In *Dueñas*, the court held that imposing the criminal conviction and court operations assessments without a hearing on the defendant's ability to pay violates due process of law under both the federal and state constitutions. (*Dueñas*, at p. 1168.) Neither statute expressly prohibits the court from considering the defendant's ability to pay. By contrast, section 1202.4, subdivisions (b)(1) and (c) expressly prohibit the trial court from considering a defendant's ability to pay a restitution fine unless the fine exceeds $300.

If the court imposes a restitution fine above the $300 statutory minimum, it may consider the defendant's ability to pay. (§ 1202.4, subd. (c).) Appellant was ordered to pay a $10,000 restitution fine, so he had the opportunity to bring to the court's attention any factors relevant to his ability to pay. (*People v. Avila* (2009) 46 Cal.4th 680, 729.) He did not do so, so he forfeited any challenges to the restitution fine. (*Ibid.*) Appellant likewise did not object to the two assessments he now challenges. We need not decide whether he forfeited his claims because under the circumstances present here, where appellant did not object to the $10,000 restitution fine, "he surely would not complain on similar grounds regarding an additional" $70 in assessments. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033.) Moreover, appellant is serving an LWOP sentence and will thus

20

be able to earn prison wages over a substantial period of time. Accordingly, any error in ordering appellant to pay the challenged assessments and fees is harmless.  (*People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


PERREN, J.


We concur:


GILBERT, P. J.


TANGEMAN, J.

John McGregor, Judge
Superior Court County of Santa Barbara

———————————————————

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.